## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.**  **1:06-CR-0199-24** |
| | : | **1:06-CR-0199-25** |
| **v.** | : | |
| | : | **(Judge Conner)** |
| **ROGELIO LOPEZ** and | : | |
| **MARTIN LOPEZ** | : | |

## MEMORANDUM

Presently before the court is the joint motion[1] (Doc. 993) of defendants

Rogelio Lopez ("Rogelio") and Martin Lopez ("Martin")[2] to suppress certain

evidence procured as the result of an investigatory stop on May 26, 2008.  Both

defendants contend that police lacked probable cause or reasonable suspicion for

the stop, during which officers seized multiple cellular telephones and ten

kilograms of cocaine.  Rogelio further argues that the cocaine must be suppressed

in his case regardless of its admissibility against Martin because he never exercised

dominion and control over the drugs.  Martin also seeks to suppress a statement

that he made to police during custodial interrogation following his arrest.  For the

reasons that follow, the motion (Doc. 993) will be denied in all respects.

---

[1]Martin filed the motion to suppress (Doc. 933) on January 8, 2009.  Rogelio
sought leave to join the motion, (see Doc. 941), which the court granted on
January 16, 2009 (Doc. 947).  Counsel for both defendants then briefed the motion as
a joint suppression request.

[2]The record contains no evidence of a familial relationship between Rogelio
and Martin.

## I. __Findings of Fact__[3]

The charges against defendants Martin and Rogelio stem from an alleged narcotics transaction that occurred at the end of the Memorial Day holiday on Monday, May 26, 2008.[4]  That evening, Chicago Police Officers William Fasan ("Officer Fasan") and Peter Kochanny ("Officer Kochanny") were patrolling the area around Pulaski Road for drag-racing activity.  (Doc. 986 at 7.)

### A. __The Initial Stop__

At approximately 10:45 p.m., the officers were traveling west on 40th Street in their marked police cruiser toward the intersection of Pulaski Road.  (Id. at 10, 35-36, 54; Suppress. Hr'g Ex. D-1.)  They had an unobstructed, well-lit view of an adjacent Burger King restaurant and its contiguous parking lot.  (Doc. 986 at 10, 13-

---

[3]These findings are based on testimonial and documentary evidence presented at the evidentiary hearing held on February 6, 2009 and substantially reflect the testimony of the police officers who participated in the investigation. Martin also testified, contradicting the officers' recollection of several material aspects of the stop and ensuing custodial interrogation.  (See, e.g., Doc. 986 at 170-73, 176, 181, 184-86, 188, 193, 196-97.)

The court finds that the officers recounted events more credibly than Martin. This finding rests upon the nature of the witnesses' testimony and upon their demeanor in court.  Officers William Fasan, Peter Kochanny, and John Moravec testified consistently with one another despite being sequestered.  All three officers remembered events with clarity and appeared composed and collected on cross-examination.  In contrast, defendant Martin Lopez appeared evasive when responding to the government's questions and fidgeted throughout his testimony. His recollection meandered and backtracked, and his skittish appearance lacked the poise of credibility exhibited by the officers.  The court has therefore adopted the description of events provided by Officers Fasan, Kochanny, and Moravec.

[4]The court takes judicial notice that Memorial Day was observed on Monday, May 26, 2008.  FED. R. EVID. 201(b), (f).

14, 108.)  They observed a black Pontiac Grand Am[5] and a green minivan parked

near one another in a remote section of the lot, which was otherwise empty.  (Id. at

11, 13, 77-78.)  The officers watched as Martin alighted from the minivan and

Rogelio and non-defendant Luiz Zuniga ("Zuniga"),[6] exited the Grand Am.  (Id. at

11-15, 46.)  The three individuals glanced in all directions to determine whether

anyone was watching them.  (Id. at 15-16, 106.)  They met one another and

conversed briefly but did not shake hands or otherwise extend a customary social

greeting.  (Id. at 15, 72, 106.)  The officers noticed the three individuals' hands come

together as if they had passed a small article between them.  (Id. at 15, 38, 72, 106.)

The police officers could not see what, if anything, the parties exchanged, but

they suspected that Martin, Rogelio, and Zuniga had conducted a hand-to-hand

drug transaction.  (Id. at 15, 38, 106.)  A hand-to-hand transaction occurs when

individuals meet to exchange contraband in person, often without social formalities.

(Id. at 13-15.)  The officers were trained to recognize hand-to-hand transactions and

had observed such transactions on numerous prior occasions.  (Id. at 14-15, 106.)

The officers drove their police cruiser toward the three individuals to

investigate the situation.  As they approached, the suspects split up and walked

hurriedly toward the opposite vehicles from those in which they had arrived:

---

[5]Officer Fasan, who was the first witness to testify, initially identified the
vehicle as a Pontiac Grant Prix but later corrected his identification, and all parties
thereafter characterized the automobile as a Grand Am.  (Doc. 986 at 11, 53.)

[6]Zuniga also uses the alias Antonio Hernandez.  (Doc. 986 at 64.)

Martin moved toward the Grand Am while Rogelio and Zuniga headed for the minivan. (Id. at 18-19, 77, 107.) The officers then noticed that the trio had exchanged car keys rather than narcotics. (Id. at 16, 82, 107.)

This activity greatly increased the officers' suspicion because the area surrounding the intersection of Pulaski Road and 40th Street has a reputation for hosting large-scale drug transactions, including car-switch transfers.[7] (Id. at 16-17, 56, 124.) A car switch occurs when two traffickers meet at a predetermined location and swap vehicles, one of which contains a contraband. (Id. at 16-17.) The transactions—typically used to transport large quantities of drugs—allow dealers to exchange products quickly and prevent them from handling controlled substances in public view. (Id.) Officer Fasan, who has patrolled the territory for at least ten years, testified that the area consists primarily of industrial parks and provides convenient access to Interstate 55. (Id. at 10-11, 87-88.) Narcotics traffickers frequently arrange large transfers in the area because they can complete the sales and leave quickly via the interstate. (Id. at 11.) Car-switch drug transactions often take place in the Burger King parking lot and at other nearby locations. (Id. 16-18,

---

[7]Defendants contend that "neither of the two officers testified that they were aware that this was a 'high crime' or drug area." (Doc. 1000 at 3.) This assertion is flatly incorrect. Officer Fasan testified that "I know that area, specifically that parking lot[. T]here have been cars switched in that parking lot for large quantities of narcotics." (Doc. 986 at 16-17.) He later explained that drug dealers "do large narcotics switches in the Burger King parking lot and in this area." (Id. at 56.) The court finds Officer Fasan's testimony credible and concludes that Officers Fasan and Kochanny knew that the parking lot where they stopped defendants had a reputation for drug-trafficking.

56-57, 123.)  Officer John Moravec ("Officer Moravec"), who did not participate in

defendants' arrests but questioned them at the police station, corroborated Officer

Fasan's testimony, characterizing the five-mile radius around 40th Street and

Pulaski Road as "*the major* area in the City of Chicago" for high-volume trafficking

in cocaine, cannabis, and heroin.  (Id. at 125 (emphasis added)).

Officers Fasin and Kochanny initiated an investigatory stop based upon their

suspicion that Martin, Rogelio, and Zuniga had conducted a car-switch drug

transaction.  They verified that Martin and Rogelio had swapped vehicle keys[8] and

requested identification from all three individuals.  (Id. at 19, 82.)  Rogelio produce a

California driver's license while Zuniga supplied a Mexican consular identification

card.  (Id. at 55.)  Martin produced an Illinois driver's license that did not match the

minivan's registration, which bore his name but was titled in Michigan.  (Id. at 19-

20.)  The lack of parity between Martin's license and registration further piqued

Officer Fasan's suspicion because individuals who relocate to Illinois must transfer

their vehicle registration within thirty days after changing domicile.  (Id. at 20); see

also 625 ILL. COMP. STAT. 5/3-801(a).  When Officer Fasan asked Martin to explain

the discrepancy between his licence and registration, Martin provided no response.

(Doc. 986 at 65.)

---

[8]Martin testified that he received the keys to the Grand Am from Rogelio but
that he gave the minivan keys to Zuniga.  (Doc. 986 at 198.)  However, Officer Fasan
unequivocally recalled that Rogelio had the keys to the minivan in his possession
when the officers arrived.  (Id. at 82.)  The court therefore concludes that Martin
gave the minivan keys to Zuniga, who subsequently passed them to Rogelio.

The officers concluded that defendants' conduct bore indicia of drug trafficking. They knew that drug dealers frequently possess firearms in connection with their trafficking activity, and they performed a preliminary pat-down search of the suspects' outer clothing to ensure their safety. (Id. at 21, 110, 119-20.) Officer Kochanny removed a phone clipped to Martin's belt during this search, and Officer Fasan discovered at least two bulky items in Rogelio's pockets that he removed and identified as cellular phones. [9] (Id. at 22, 42, 102.) The officers removed a total of five or six phones from the three suspects. (Id. at 22.) The officers confiscated the phones because, in their experience, arrestees sometimes carry blunt objects similar in size and shape to cellular phones that can be used as weapons. (Id. at 102.) Phones can also be used to conceal knives, shanks, or other implements with which a suspect could injure an officer. (Id. at 21-22, 102.) Removal of the phones again heightened the officers' suspicion because drug dealers frequently carry several phones to conceal the calls required to arrange drug transactions. (Id. at 22.)

## B.    **The Search of the Minivan**

The officers questioned the individuals about the car switch, and Rogelio stated that he was borrowing the minivan from Martin to take his family on vacation. (Id. at 23, 111.) This explanation struck the officers as disingenuous because the car swap occurred late at night in a commercial parking lot at the end

---

[9]Officer Fasan testified that Rogelio was carrying multiple cellular phones but did not specify the precise number. (Doc. 986 at 42.)

of the Memorial Day weekend.  (Id.)  In the officers' experience, vacationers who

borrow automobiles typically exchange the vehicles at home during daylight hours

in advance of a holiday rather than after it.  (Id.)

Officer Fasan requested Martin and Rogelio's consent to search the minivan

in light of his much-aroused suspicion.  Both defendants granted oral consent to

search the minivan, through Rogelio informed the officers that the van did not

belong to him.  (Id. at 24-25, 45-46, 103, 199-200.)  The investigatory stop had been in

progress for less than five minutes at the time Officer Fasan solicited consent.  (Id.

at 24.)  Neither he nor Officer Kochanny had not drawn their weapons, and all

questioning had occurred in normal, conversational tones.  (Id.)  Officer Fasan

placed Martin, Rogelio, and Zuniga in the rear of his police cruiser while Officer

Kochanny searched the minivan.  (Id. at 25.)  Officer Kochanny entered the minivan

through the driver's door and immediately noticed a large amount of sound-

deadening foam strewn across the floor behind the driver's seat.[10]  (Id. at 96.)

Manufacturers install such foam inside the exterior walls of automobiles to

minimize road noise in the passenger cabin, and the foam can only be removed by

opening the interior walls of the vehicle.  (Id. at 96-97.)  Officer Kochanny inspected

the door panels and opened the jack compartment, where he discovered a black

brick that he suspected to contain narcotics.  (Id. at 97.)  Officer Kochanny called

---

[10]Officer Kochanny recognized the foam from his youth, when his older
brother worked in an auto body shop.  Officer Kochanny assisted his brother with
installation and removal of the foam on numerous occasions.  (Doc. 986 at 96-97.)

Officer Fasan's attention to the drugs, and the officers arrested all three individuals. (Id. at 27.)  Officer Fasan immediately read them their rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and both Martin and Rogelio indicated that they understood the Miranda warnings.  (Doc. 986 at 27-28.)  Police seized a total of ten kilograms of cocaine from the minivan.[11]

## C.    <u>Custodial Interrogation</u>

The officers called for backup and transported Martin, Rogelio, and Zuniga to the police station, where the suspects were separately interviewed.  (Id. at 30.) Officer Fasan again read them Miranda warnings, and both Martin and Rogelio again stated that they understood their rights.  (Id. at 28-30.)  Officer Moravec questioned Martin, who declined to cooperate but stated that "he was in fear of his life or his family's lives."  (Id. at 31; see also id. at 123.)  Rogelio invoked his right to remain silent.  (Id. at 126.)

Neither Martin or Rogelio requested representation from counsel at any point during the evening.  (Id. at 31, 98, 123.)  Police conducted all discussions in English.  Although Martin and Rogelio speak Spanish, both defendants understood and conversed fluently in English.  (Id. at 79-81.)  Neither defendant requested the services of an interpreter.  (Id. at 80.)

---

[11]The officers did not search the Grand Am at the scene; however, a later search at the police impound facility yielded no articles of contraband.  (Doc. 986 at 64, 91-95.)

### D. **Procedural History**

Martin and Rogelio filed the instant motion (Doc. 933) to suppress all physical evidence, including the cellular phones and cocaine, obtained as a result of the stop on the ground that the officers lacked probable cause or reasonable suspicion to investigate their activity. They further assert that they did not consent to the search of the minivan. Rogelio alternatively argues that the evidence should be suppressed in his case because he exercised no control over the cocaine, and Martin seeks to suppress the statement he made to Officer Moravec at the police station. The court heard approximately four hours of testimony on February 6, 2009, after which the parties filed supplemental briefs. (Docs. 993, 1000.) Defendants' motion is now ripe for disposition.

## II. **Discussion**

The instant motion presents a series of related legal issues. First, the court must assess whether Officers Fasan and Kochanny properly stopped defendants for the purpose of investigating suspected criminal activity. Second, the court will consider whether the officers properly removed defendants' cellular telephones during the preliminary pat-down search. Third, the court will determine whether defendants granted consent to search the minivan and whether the cocaine seized therefrom must be suppressed in Rogelio's case regardless of its admissibility against Martin. Fourth, the court will turn to the admissibility of Martin's custodial statement to Officer Moravec.

## A.     Propriety of the Initial Stop

The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. CONST. amend IV.  Searches and seizures executed without a warrant are presumptively unreasonable unless an exception to the warrant requirement covers the search.  Arizona v. Gant, --- U.S. ---, 2009 WL 1045962, at *5 (U.S. Apr. 21, 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).  Under the exception announced in Terry v. Ohio, 392 U.S. 1 (1968), police may detain a suspect and conduct a brief investigation if they possess a reasonable suspicion that "criminal activity may be afoot."  United States v. Sokolow, 490 U.S. 1, 7 (1989); see also Ornelas v. United States, 517 U.S. 690, 693 (1996).  The officers' suspicion need not rise to the level of probable cause.  Arizona v. Johnson, --- U.S. ---, 129 S. Ct. 781, 786 (2009); United States v. Mathurin, --- F.3d ----, 2009 WL 792462, at *3 (3d Cir. Mar. 27, 2009); United States v. Crandell, 554 F.3d 79, 84 (2009).  However, police must identify objective, particularized facts that validate an inference of criminal activity, and law enforcement hunches or generalized suspicion do not support detention.  Mathurin, --- F.3d at ----, 2009 WL 792462, at *3 (quoting Ornelas, 517 U.S. at 696).  Officers may rely upon their specialized training and experience in formulating a reasonable suspicion.  United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002).

Reasonable suspicion supported the investigatory detention of defendants in this case.  While working a nighttime shift, Officers Fasan and Kochanny observed Martin, Rogelio, and Zuniga exit their vehicles in a secluded section of an otherwise

10

empty parking lot. They walked toward one another while continually surveying

their surroundings and appeared to exchange a small article without first shaking

hands. The officers knew that the surrounding area had a reputation for drug

trafficking, and they suspected that defendants had conducted a hand-to-hand

narcotics transaction. These circumstances support an inference of drug-related

activity, and the officers properly detained defendants for the purpose of

conducting a <u>Terry</u> investigation. <u>See, e.g.</u>, <u>United States v. Smith</u>, 282 F. App'x

143, 148 (3d Cir. 2008) (holding that officers possessed reasonable suspicion to

detain a suspect based exclusively on their surveillance of a hand-to-hand drug

transaction); <u>United States v. Parker</u>, No. 05-CR-702, 2006 WL 964488, at *3 (E.D.

Pa. Apr. 13, 2006) (concluding that officers properly performed a <u>Terry</u> stop after

observing two suspects meet on a street corner and exchange cash for a small

object that the officers believed to be narcotics).

### B. <u>Preliminary Pat-Down and Removal of Cellular Telephones</u>

Officers are entitled to conduct a brief "pat-down" of a suspect's clothing,

and a brief search of surrounding accessible areas, if they have a reasonable

suspicion that the individual may be armed or otherwise pose a threat to their

safety. <u>See</u> <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 372-74 (1993); <u>see also</u> <u>Michigan v.</u>

<u>Long</u>, 463 U.S. 1032, 1049-51 (1983). "[T]he issue is whether a reasonably prudent

man in the circumstances would be warranted in the belief that his safety or that of

others was in danger." <u>Long</u>, 463 U.S. at 1050 (quoting <u>Terry</u>, 392 U.S. at 21). To

justify a protective pat-down, officers must identify an "articulable and objectively

reasonable belief that the suspect is potentially dangerous." <u>Long</u>, 463 U.S. at 1051;

<u>Leveto v. Lapina</u>, 258 F.3d 156, 164 (3d Cir. 2000).

Officers may remove objects that reasonably feel like weapons or that are immediately recognizable as contraband during a pat-down search. <u>United States v. Hall</u>, 193 F. App'x 125, 131 (3d Cir. 2006) (citing <u>Dickerson</u>, 508 U.S. at 375-76). Hence, an officer may confiscate "hard, bulky object[s],"—such as a stack of credit cards, a bundle of cash, or a cellular phone—that feel like implements that could be used to inflict injury. <u>United States v. Edwards</u>, 53 F.3d 616, 619 (3d Cir. 1995); <u>United States v. Pasca</u>, No. Crim. 07-00182-2, 2008 WL 1752239, at *1, *13 (W.D. Pa. Apr. 14, 2008).

Reasonable suspicion supported the pat-down search in which Officers Fasan and Kochanny removed defendants' cellular phones. As officers approached the suspects, Rogelio, Martin, and Zuniga hurried toward the opposite vehicles from those in which they had arrived. Officers noticed that the suspects had exchanged vehicle keys rather than contraband. As a result of their law enforcement training and experience, and in light of the proximity of the parking lot to the interstate, the officers reasonably believed that the suspects had conducted a car-switch transaction instead of a hand-to-hand sale. The officers knew that car-switch transactions could involve large amounts of drugs and that parties to such transactions are frequently armed. Hence, it was reasonable for them to believe that the suspects may have been armed and dangerous "because weapons and violence are frequently associated with drug transactions." <u>See</u>

12

United States v. Childs, 131 F. App'x 347, 348 n.2 (3d Cir. 2005) (quoting United States v. Robinson, 119 F.3d 663, 337 (8th Cir. 1997)).  The officers were therefore entitled to conduct a pat-down search for their safety.

During the search, Officer Fasan obtained multiple cellular phones from Rogelio's pockets, and Officer Kochanny removed a phone from Martin's belt.  Both officers' actions were reasonable and appropriate under the circumstances.  Officer Fasan removed Rogelio's phones after feeling them from the exterior of Rogelio's clothing.  He appropriately recognized that a bulky object such as a cellular phone was a potential weapon, and he was permitted to remove the item for safety purposes.  Edwards, 53 F.3d at 619 (stating that officer may remove blunt objects—such as a stack of credit cards—that could reasonably feel like a weapon).  Officer Kochanny also acted reasonably by confiscating Martin's phone because suspects may use such objects to conceal knifes, shanks, and other weapons that could threaten officer safety.  Accordingly, the court concludes that the officers did not exceed the scope of a Terry pat-down by removing defendants' cellular phones.

### C.  Seizure of the Cocaine Found in the Minivan

Defendants' challenge to the admissibility of the cocaine discovered in the minivan's jack compartment presents two distinct sub-issues, to wit:  (1) whether the officers obtained consent for the search; and (2) whether Rogelio lacked control over the cocaine such that it must be suppressed from his case regardless of its admissibility against Martin.

## 1.    Consent to Search the Minivan

Police may search a vehicle without a warrant if the driver of the vehicle voluntarily consents to the search.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219, 222 (1973); <u>United States v. Wilson</u>, 413 F.3d 382, 388 (3d Cir. 2005).  The voluntariness of an individual's consent depends upon the totality of the circumstances, including factors such as "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]."  <u>Wilson</u>, 413 F.3d at 388 (alteration in original) (quoting <u>United States v. Givan</u>, 320 F.3d 452, 459 (3d Cir. 2003)).  The government shoulders the burden of proving the validity of consent.  <u>See</u> <u>Schneckloth</u>, 412 U.S. at 222.

In the instant matter, both Martin and Rogelio granted oral consent for the search of the minivan.[12]  (Doc. 986 at 25, 102-03.)  Defendants contend that this consent was invalid because the officers procured their consent by detaining them for an excessive period of time under circumstances designed to coerce them to assent to the search.  (Doc. 1000 at 10.)

---

[12]Martin testified that the officers never solicited his consent to search the van.  (Doc. 986 at 173, 186.)  The court finds Martin's testimony incredible insofar as it contradicts the statements of the officers.  <u>See</u> <u>supra</u> note 3.  Martin further testified that the officers sought consent for the minivan search from Rogelio, who informed them that he did not own the van.  (Doc. 986 at 199-200.)  In light of the court's conclusion that both Martin and Rogelio consented to the search of the van, the court expresses no opinion regarding whether Rogelio could have consented to the search had Martin objected to it.

When performing a <u>Terry</u> stop, police may detain a suspect only for the amount of time "necessary to effectuate the purpose of the stop." <u>United States v. Sharpe</u>, 470 U.S. 675, 684 (1985); <u>United States v. Bonner</u>, 363 F.3d 213, 225 (3d Cir. 2004). Officers must diligently pursue their investigation and must release the detained individual upon dispelling their suspicions of criminal activity. <u>Sharpe</u>, 470 U.S. at 675; <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983); <u>United States v. Munoz-Villalba</u>, No. 1:05-CR-248, 2005 WL 30580164, at *6 (M.D. Pa. Nov. 15, 2005). If officers obtain a suspect's consent to search by detaining the suspect in violation of his or her constitutional rights, the consent may be rendered invalid and the evidence suppressed. <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963); <u>Crandell</u>, 554 F.3d at 87.

In this matter, Officers Fasan and Kochanny performed a reasonable investigatory detention, and defendants voluntarily consented to the search. The officers requested consent approximately five minutes after initiating the investigatory stop. During this time, they expeditiously investigated defendant's activity by asking defendants for identification, questioning them about the purposes of the car-swap, and performing a pat-down search for weapons. Officers Fasan and Kochanny spoke to defendants in normal, conversational tones, and their sidearms remained holstered throughout the stop. Both Martin and Rogelio comprehended the officers and conversed fluently in English. Accordingly, the

court concludes that the officers acted reasonably under the circumstances and that

defendants voluntarily consented to the search of the minivan.[13]

### 2. Admissibility of Cocaine Seized from the Minivan against Rogelio

Rogelio also moves to suppress the cocaine seized from the jack

compartment on the basis that he did not exercise "dominion and control over the

[minivan] or the drugs in the vehicle[,] and therefore [he] never had possession of

the illegal narcotics." (Doc. 1000 at 13.) Essentially, Rogelio contends that Officers

Fasan and Kochanny had no reason to link him with the cocaine in Martin's

vehicle, thereby undermining probable cause for his arrest.

---

[13]The court alternatively finds that the officers possessed probable cause to search the minivan notwithstanding defendants' consent. In the automobile context, police need not obtain a warrant to search a vehicle if "probable cause exists to believe it contains contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also United States v. Johns, 469 U.S. 478, 484 (1984) (quoting United States v. Ross, 456 U.S. 798, 823 (1982)) (""[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband."). Here, the officers observed defendants swapping vehicles under circumstances strongly suggestive of a drug transaction in an area known for drug crime. Upon exiting their vehicles, defendants surveyed their surroundings to determine whether they were being watched, and they fled toward opposite cars when the officers arrived. These actions are suggestive of a car-swap drug transaction, and defendants provided incongruous responses to the officers' questions about their activities. Hence, Officers Fasan and Kochanny possessed probable cause to believe that defendants' vehicles contained contraband and could have searched the automobiles regardless of defendants' consent. See United States v. Ocampo, 937 F.2d 485, 490 (9th Cir. 1991) (finding that a warrant for a vehicle search was supported by probable cause in light of defendant's counter-surveillance techniques, tandem driving, switching of cars, and numerous telephone calls), cited with approval in United States v. Garcia-Moreno, 130 F. App'x 603, 606 (3d Cir. 2005).

"[T]he probable cause standard is a 'practical, nontechnical conception' that 'deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).  A police officer possesses probable cause to arrest if the totality of the circumstances reasonably intimate that a discrete individual has committed a crime.  Id. at 371; United States v. Yusuf, 461 F.3d 374, 390 (3d Cir. 2006).  The officer must identify circumstances that link a particular individual to criminal activity; "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search [or arrest] that person."  Pringle, 540 U.S. at 372-73 (quoting Sibron v. New York, 392 U.S. 40, 62-63 (1968)); United States v. Shields, 458 F.3d 269, 277 (3d Cir. 2006) (reiterating that a search or seizure "must be supported by probable cause particularized with respect to" the person searched or arrested (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979))).

In the context of contraband seizures, the arresting officer must entertain *particularized* suspicion that links a suspect to the illicit item.  However, the officer is not required to identify a *single* individual to whom the contraband belongs, and the officer may arrest any individual engaged in a common enterprise with respect to the item.  For example, in Maryland v. Pringle, police searched an automobile containing three occupants and discovered $763 in cash and several glassine bags of cocaine.  540 U.S. at 368.  Officers informed the three individuals that they would all be placed under arrest unless one of them accepted responsibility for the drugs.  Id.

17

The individuals remained silent, and police took all of them into custody.  Id.  The respondent later confessed to ownership of the cocaine.  Id. at 369.  Prior to trial, he moved to suppress the statement on the ground that police lacked particularized probable cause to believe that he—rather than the other occupants of the vehicle—was responsible for the cocaine.  Id.

The Supreme Court rejected the respondent's challenge, concluding that the arresting officers could have drawn "an entirely reasonable inference . . . that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine."  Id. at 372.  The Court explained that the quantity of cocaine provided strong evidence of drug dealing, and a dealer would be unlikely to transport large quantities of drugs in the presence of individuals uninvolved in the drug-trafficking enterprise.  Id. at 373.  They were permitted to arrest all three individuals because they could reasonably have believed that all occupants of the vehicle were participating in a shared criminal enterprise at the time of the arrest.

 Like in Pringle, Officers Fasan and Kochanny possessed probable cause to believe that Martin, Rogelio, and Zuniga were participating in a common scheme

with respect to the cocaine seized from Martin's minivan.[14]  Rogelio and Zuniga rendezvoused with Martin under circumstances indicative of a car-switch drug transaction.  When the officers arrived, Rogelio had keys to the minivan and was hurrying toward the vehicle.  He later admitted that he was borrowing the minivan, purportedly for the purpose of vacationing.  Based upon this suspicious conduct and the cocaine later discovered in the jack compartment, Officers Fasan and Kochanny could have reasonably concluded that Martin was tendering a shipment of drugs to Rogelio as part of a macroscopic drug-distribution scheme.[15]  They possessed probable cause to arrest Rogelio for trafficking based upon the circumstances known to them at the time they placed him in custody.  Accordingly, the motion to suppress the cocaine will be denied.

———————————————

[14]Unlike <u>Pringle</u>, the instant matter involves two motor vehicles rather than one; however, this factual distinction does not preclude application of <u>Pringle</u> to defendants' conduct.  Martin, Rogelio, and Zuniga were the only individuals present during the car switch, and the secretive context of the transaction creates particularized suspicion that all three individuals were privy to the exchange of drugs.  Hence, like the officers in <u>Pringle</u>, Officers Fasan and Kochanny possessed reasonable grounds to believe that all three individuals were in league with one another and bore responsibility for the drugs.  Reasonable officers could therefore have concluded that all three suspects knew that cocaine was present and intended to exercise dominion over it.

[15]The government bolsters this conclusion with testimony that Rogelio planned to deliver ten kilograms of cocaine from Chicago to co-conspirators in Pennsylvania soon after the transaction with Martin.  (Doc. 986 at 131-34.)  This testimony suggests that Rogelio was involved in a drug-distribution scheme with co-conspirators who have not joined the pending motion.  It also corroborates Officer Fasan and Kochanny's conclusion that Rogelio intended to exercise control over the cocaine and provides further support for the court's denial of the suppression motion.

### D.    **Martin's Statement at the Police Station**

Statements made by a suspect during custodial interrogation are admissible only if police have apprised the individual of his or her rights under Miranda v. Arizona, 384 U.S. 436 (1966),[16] and the suspect chooses to waive them knowingly and voluntarily.  Id. at 444, 475.  If a suspect invokes the right to counsel, police must cease interrogation until counsel is present, Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), and any statements made in counsel's absence must be suppressed, United States v. Tyler, 164 F.3d 150, 162 (3d Cir. 1998).

The court evaluates whether a suspect requested counsel from an objective viewpoint.  Davis v. United States, 512 U.S. 452, 458-59 (1994).  "Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  Id. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 174, 178 (1991)); accord United States v. Tyree, 292 F. App'x 207, 211 (3d Cir. 2008) (reiterating that police must cease questioning only if a suspect unambiguously asserts the right to remain silent or requests counsel).  The suspect must solicit counsel with sufficient clarity to enable a reasonable officer to understand the request.  Davis, 512 U.S. at 459; Flamer v. Delaware, 68 F.3d 710, 725 (3d Cir. 1995).  The government bears the

---

[16]Police must inform suspects that (1) they have the right to remain silent, (2) any statements they choose to make may be introduced against them in court, (3) they have a right to an attorney, and (4) an attorney will be appointed for them if they cannot afford to retain one.  Miranda, 384 U.S. at 479.

burden of establishing a waiver of a defendant's <u>Miranda</u> rights.  <u>Colorado v.</u>

<u>Connelly</u>, 479 U.S. 157, 168 (1986).

In the present matter, Officers Fasan, Kochanny, and Moravec testified that

Martin did not request an attorney at any time during his arrest and interrogation.

Officer Fasan read <u>Miranda</u> warnings to Martin at the scene of the stop, after which

Officer Kochanny transported him to the police station.  (Doc. 986 at 27-29.)  Officer

Fasan placed Martin, Rogelio, and Zuniga in an initial intake room, where he again

apprised them of their <u>Miranda</u> rights.  (<u>Id.</u> at 30.)  Martin indicated that he

understood the <u>Miranda</u> warnings on both occasions.  (<u>Id.</u> at 27, 30.)  Officer Fasan

then directed Martin to an interrogation room and remained with Martin as Officer

Moravec questioned him.  (<u>Id.</u> at 30.)  Martin refused to cooperate because "he was

in fear of his life or his family's lives."  (<u>Id.</u> at 31.)  Officer Fasan testified that Martin

did not request an attorney while Martin was in his custody:

> Q.    During the entire time period that you were with the
>       defendants, both at the scene at the Burger King parking lot
>       and back at the police station, both in the interview room and
>       the room [in which the suspects] were waiting to be interviewed,
>       and when you were taking them to and from the interview room,
>       did . . . either one of the defendants request an attorney?
> A.    No.
> Q.    Specifically did Martin Lopez request an attorney.
> A.    No.

(<u>Id.</u>)  Officers Kochanny and Moravec also confirmed that Martin did not request an

attorney in their presence.  (<u>Id.</u> at 98, 123.)  Hence, the officers' collective testimony

reflects that Martin did not solicit the assistance of counsel at any time during his

custodial detention.

Martin contradicted the officers' recollections.  According to Martin, he requested an attorney during questioning by Officer Moravec.  He stated that the officer "was asking me to cooperate with them, and I was like I need to talk to my lawyer, I'm not going to tell you nothing." (Id. at 176.)  Officer Moravec then returned Martin to the intake room.  When Martin again asked for an attorney, Officer Moravec allegedly responded:  "[Y]ou didn't cooperate with us[. W]hy do you want me to be nice with you[?]" (Id. at 177.)

The court finds that Officers Fasan, Kochanny, and Moravec provided the more reliable testimony with regard to Martin's avowed request for counsel.  The officers described the events surrounding Martin's arrest with lucid clarity, and none of them recalled a request for counsel by Martin.  Martin's testimony, on the other hand, displayed an air of obliqueness.  He appeared agitated while on the stand.  He frequently referred to Officer Moravec as "the bald head," (id. at 175, 176, 187), and accused the officers of lying, (id. at 176, 180, 181, 186).  The latter denouncements he punctuated with accusatory, pointing gestures in the direction of the prosecutor.  The court concludes that these overwrought histrionics and Martin's in-court deportment reflect an attitude of insincerity and therefore credits the testimony of the officers.

In light of this credibility finding, the government has established that the officers properly apprised Martin of his <u>Miranda</u> rights and that he knowingly and voluntarily waived them by responding to Officer Moravec's questions. The motion to suppress Martin's statement will be denied.[17]

**III.  Conclusion**

For the reasons set forth above, Martin and Rogelio's motion to suppress will be denied in all respects.

An appropriate order follows.

  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      April 28, 2009

---

[17]Martin alternatively contends that police elicited his statement in violation of his Sixth Amendment right to counsel; however, Sixth Amendment rights do not attach until "the time that adversary judicial proceedings have been initiated against [the accused] . . . by way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>Estelle v. Smith</u>, 451 U.S. 454, 469-70 (1981). Martin had not been indicted or arraigned at the time he spoke to Officer Moravec, and the Sixth Amendment thus affords him no relief.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.**   **1:06-CR-0199-24** |
| | : |                 **1:06-CR-0199-25** |
| **v.** | : | |
| | : | **(Judge Conner)** |
| **ROGELIO LOPEZ and** | : | |
| **MARTIN LOPEZ** | : | |

## ORDER

AND NOW, this 28th day of April, 2009, upon consideration of the motion to

suppress evidence (Doc. 933), and for the reasons set forth in the accompanying

memorandum, it is hereby ORDERED that the motion (Doc. 933) is DENIED.


                               _S/ Christopher C. Conner_
                               CHRISTOPHER C. CONNER
                               United States District Judge